MEMORANDUM OF DECISION
This memorandum of decision addresses petitions for termination of the parental rights (TPR) of Antoinette D. and David J., Sr. (David Sr.), the biological parents of five minor children: Antwoine D., born November 1989; David J., born October 1993; Olivia J., born January 1995; Sarah J., born January 1996; and Andrea J., born August 1997. The Department of Children and Families (DCF) filed a TPR petition on March 15, 1999 as to Andrea, and amended this petition on September 9, 1999. DCF filed TPR petitions on May 17, 2000 as to the remaining children. On December 12, 2000, the second day of the TPR hearing, David Sr. consented to the petitions affecting all of the children. (Rubinow, J.) As to Antoinette D. and all five of the children, the petitions allege the grounds of abandonment and failure to rehabilitate. As to Antoinette D. and Andrea, alone, the ground of no ongoing parent child relationship has been added through the amendment of September 9, 1999. For the reasons stated below, the court finds these matters in favor of the petitioner.
Andrea came into DCF's custody through an Order of Temporary Custody (OTC) entered August 7, 1997. (Mclachlan, J.). On October 29, 1997, following a court hearing, Andrea was adjudicated a neglected child and was committed to DCF for a period of twelve months. (Holden, J.). Thereafter, on October 28, 1998, her commitment was extended for an CT Page 4853 additional twelve months (Holden, J.), and was extended again on October 6, 1999 "until further order of the court." (Lopez, J.)
Antwoine, David, Olivia and Sarah came into DCF's custody through an OTC dated January 26, 1998. (Holden, J.) They were committed to DCF for a period of twelve months following a neglect adjudication on March 11, 1998. (Holden, J.) The commitment was extended as to these children on March 10, 1999 (Doherty, J.), and was extended again on February 29, 2000 (Lopez, J.) and on March 7, 2001, effective through March 11, 2002 (Dewey, J.).
As to Andrea, continuing efforts to reunify this child with her parents were found by the court to be inappropriate, after hearing on October 28, 1998. (Holden, J.) As to Antwoine, David, Olivia and Sara, after hearing on March 10, 1999, the court determined that reasonable efforts to reunify these children with David Sr. were not appropriate, but the court determined that reasonable efforts to reunite Antoinette with her children should continue. (Doherty, J.)
The termination of parental rights trial commenced on December 11 and continued through December 13, 2000. The respondent mother was present and represented by counsel at each court session. The petitioner and the minor children were represented by their respective attorneys throughout the trial. Counsel for the minor children, also serving as their GAL,[2]
presented closing argument to the court, as did counsel for the parties to this action.
The parties introduced voluminous documentary exhibits into evidence during the trial, including psychological notes; treatment, laboratory and hospital records; social studies and permanency plans. Testimony was elicited from multiple witnesses including foster parents, family members, a probation officer, and social workers.[3]
The Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of these children.
 I. FACTUAL FINDINGS
The court has carefully considered the verified petitions, all of the evidence, including the social studies, psychological examination, and testimony presented, according to the standards required by law.[4]
Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial:
 A. ANTOINETTE D., THE MOTHER
CT Page 4854 1. EVENTS PRIOR TO ANDREA'S NEGLECT ADJUDICATION ON OCTOBER 29, 1997
Antoinette D. was born on September 1963. Her first child, Jovan, who resides with his paternal grandmother, is not the subject of this action. David Sr., the father of her remaining five children, has been her partner for many years. (Exhibits 5, 6, 8.)
A high school graduate, Antoinette D. describes herself as a licensed CNA[5] who has held a "couple of jobs" in that field, and who has also worked as a cashier, in fast food restaurants and in factory situations. (Exhibits 15, 17, 32.) Antoinette D.'s history of daily heroin abuse commenced in her mid-twenties, adversely affecting her ability to work.[6] (Exhibits 5, 6, 8, 15, 32.) Her chronic use of cocaine commenced some years later.[7] (Exhibit 8.)
Antoinette D. has been known to DCF since the fall of 1993, upon referral by the hospital where David was born, for attention to issues of neglect and substance abuse. (Exhibit 33.) Olivia was born on January 1995. Antoinette D., who had received no prenatal care, had used cocaine, heroin and methadone up until the day of her admission for Olivia's delivery, and both mother and child tested positive for opiates and methadone upon admission. After undergoing evaluation for drug use at Connecticut Counseling Centers, Inc. (Connecticut Counseling) on March 27, 1995, that agency recommended outpatient substance abuse counseling on its premises. However, Antoinette D. participated in only three out of eight scheduled appointments through April 25, 1995, after which she was discharged for non-compliance and lack of attendance. (Exhibits 5, 32.)
Sarah was born to Antoinette D. on January 1996. On August 1, 1997, she gave birth to Andrea, who also tested positive for heroin and cocaine at delivery. (Exhibits 6, 27.) Through DCF, New Beginnings sponsored a Physical Health Nurse to assist Antoinette D. in learning infant care. However, these services were discontinued after several months of unsuccessful home visits by the nurse. (Exhibit 32.)
On August 15, 1997, Antoinette D. was instructed by the court (Lopez, J.) to take specific steps to facilitate the return of Andrea to her custody. (Exhibit 1.) Those steps required her, among other things, to visit Andrea as often as DCF permits; to participate in parenting counseling and a drug/alcohol evaluation; to cooperate with random drug screens or tests; to refrain from substance abuse and involvement with the criminal justice system; to accept and cooperate with in home support services referred by DCF; and to secure and maintain adequate housing and legal income. CT Page 4855
On August 18, 1997, after missing two prior scheduled appointments, Antoinette D. underwent a substance abuse evaluation at the Morris Foundation, to which she was referred by DCF. (Exhibits 6, 32, 33.) Antoinette D. was found to meet the criteria for medically managed intensive inpatient detoxification at that time. (Exhibit 6.) DCF also referred Antoinette D. to Merritt Hall through Connecticut Valley Hospital, and to the Meridian Hills program for substance abuse treatment. However, Antoinette D. failed to initiate contact with these facilities, and thus did not meet the requirement for their services. (Testimony of Cynthia P.)
 2. EVENTS FOLLOWING OCTOBER 29, 1997, BUT PRIOR TO THE NEGLECT ADJUDICATION OF MARCH 11, 1998
On January 8, 1998, Antoinette D. was admitted to the Cornerstone Facility at Eagle Hill, where she remained until her discharge on January 14, 1998.[8] (Exhibits 7, 15.) Antoinette D. stated that this admission represented her first substance abuse treatment. She underwent detoxification and methadone management, and was discharged "with aftercare appointments having been arranged." (Exhibit 7.) As noted above, Antwoine, David, Olivia and Sarah were placed in DCF's custody on January 26, 1998.
Thereafter, Antoinette D. attended an in-patient substance abuse treatment at the Women's and Children's Program at the Morris Foundation, where on January 28, 1998, she was diagnosed with "Substance Dependence without sustained full remission" by Michelle D. (Exhibits 8, 33.) Antoinette D. was transferred to the Morris Foundation Therapeutic Shelter on February 4, 1998 due to her persistent denial of addiction problems, as well as the need for a more intensive inpatient substance abuse treatment program. She remained at that facility until she entered the McCall Foundation Carnes Weeks facility on February 17, 1998. (Exhibits 33, 34.)
On February 4, 1998, Antoinette D. was instructed by the court (Holden, J.) to take specific steps to facilitate the return of Antwoine, David, Olivia and Sarah to her custody. (Exhibit 2.) Those steps essentially reiterated the requirements of the August 15, 1997 orders, and added the obligations that she participate in parenting and individual counseling, undergo a a drug/alcohol assessment, and follow the recommendations of the drug and alcohol evaluator.
On March 11, 1998, the court (Holden, J.) issued expectations for Antoinette D. to follow in her effort to secure the return of Andrea as well as Antwoine, David, Olivia, Sarah. (Exhibit 3.) These expectations essentially reiterated the specific steps previously provided to her, CT Page 4856 including, among other things, the obligation to visit the children as often as DCF permits; to participate in parenting and individual counseling; to obtain random drug screens; to refrain from substance abuse and involvement with the criminal justice system; and to secure and maintain adequate housing and legal income. These expectations also specifically required Antoinette D. to obtain family counseling, if and when it was recommended; and to participate in drug/alcohol counseling through completion of the McCall in-patient program; and to adhere to recommendations for any aftercare.
 3. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF MARCH 11, 1998
On March 18, 1998, Antoinette D. was transferred to a McHall Foundation halfway house for medium-term inpatient substance abuse treatment. She remained at that facility through early September 1998. (Exhibits 9, 15, 33, 34.) She thereafter participated in outpatient substance abuse treatment at the Joseph Center until approximately November 1998. (Exhibit 35.)
From January 1999 through October 1999, Antoinette D. received counseling at the Family Service of Greater Waterbury (FSGW). (Exhibit 14).
On June 24 and 26, 1999, Antoinette D. and Andrea were the subject of court-ordered psychological evaluations and interactional assessments performed by Michael Haymes, Ph.D., a forensic psychologist. At the time, Antoinette D. was thirty-five years old, and Andrea was approximately twenty-two months of age. Antoinette D. was found to be of low average intelligence. (Exhibits 17, 18.) Antoinette D. was "reluctant and often unwilling" to provide information in response to Dr. Haymes's inquiries. He observed elements of intense anxiety which appeared to be causing her sleep deprivation, and found her to be "an anxious, obsessive and negativistic person" who "showed little awareness of the needs of others." He further opined that despite reported participation in psychotherapy and attendance at NA meetings, Antoinette D.'s "long term use of drugs appears to have impaired her overall personality development and ability to cope with the stresses of life." (Exhibit 18.)
In the Spring of 1999, DCF offered family reunification services to Antoinette D. through Boys Village. However, she was unwilling to allow Boys Village workers into her home once per week, as required by the provider, and she advised DCF that she did not want that service. (Testimony of Cynthia P.)
 4. EVENTS FOLLOWING THE FILING OF THE AMENDED TERMINATION PETITION AS TO ANDREA ON SEPTEMBER 9, 1999
CT Page 4857
The court had ordered Antoinette D. to be evaluated by Dr. Richard Sadler on December 1, 1999, but she did not participate due to her late arrival. (Exhibit 36.) On that date, she advised DCF that she suffered from kidney failure and depression for which she was receiving medication, and that she had been advised by her physician that she should not work. However, she refused to sign releases which would have permitted DCF to speak with her physicians to obtain additional information.[9] (Exhibit 23.) Although reference was made to governmental disability payments received by Antoinette D., no specific evidence was presented concerning the nature or extent of any designated impairment, or the amount of any financial distributions to the respondent.
On December 21, 1999, Antoinette D. submitted to a hair analysis at the Morris Foundation, indicating relatively recent use of cocaine, morphine and codeine. She was unable or unwilling to submit a urine specimen on that day, precluding measurement of current use or abstinence. (Exhibit 36.) On January 28, 2000, DCF recommended another substance abuse evaluation for Antoinette D., but she failed to participate. (Exhibit 23.)
On February 28, 2000, Antoinette D. sought treatment for her opiate dependency and medically monitored detoxification from Advanced Behavioral Health, Inc. (ABH), another substance abuse program. At that time, she admitted to intra nasal use of three bags of heroin a day and concomitant use of crack cocaine. (Exhibits 12, 13.) Laboratory analysis on that date also established her recent use of benzodiazapines and cannabinoids. (Exhibit 13.) Antoinette D. was then taking Celexa for depression, as well. (Exhibits 13, 17.) She was admitted to the South Central Rehabilitation Center (SCRC), where she remained in residence through March 13, 2000. She completed detoxification without any complications, was noted to be suffering from depression, and was discharged to aftercare substance abuse treatment services with the Morris Foundation. (Exhibit 13.)
On January 10, 2000 FSGW, where Antoinette D. had received preliminary counseling in late 1999, closed their file due to her lack of compliance with that agency's recommendations. (Exhibits 11, 14.) At about that time, Antoinette D.'s DCF worker reported an inability to reach her at the telephone assigned to her current apartment. (Exhibit 19.)
On March 29, 2000, Antoinette D. returned to FSGW and requested resumption of her counseling. She complained of anxiety and reported past cocaine dependency without recent use. Antoinette D. was diagnosed as having generalized anxiety and major depression, in addition to her CT Page 4858 substance dependence.[10] FSGW recommended individual psychotherapy for Antoinette D. (Exhibit 14.) However, she failed to attend appointments as scheduled, and therefore the agency again closed their file in May of 2000. (Exhibits 15, 16.)
Upon the order of the court, David A. Krulee, M.D. conducted a psychiatric competency evaluation on Antoinette D. on May 8, 2000.[11]
Determining that she was capable of understanding the nature of the proceedings against her and of adequately assisting her attorney in her defense, Dr. Krulee also concluded that Antoinette D. met the diagnostic criteria for depression, anxiety disorder, and "Opioid Dependence, in early partial remission." (Exhibit 17.)
On May 11, 2000, Antoinette D. obtained a substance abuse assessment at FSGW. She reported the prior use of opiates, heroin, barbiturates, cocaine, tranquilizers, and other drugs. She identified heroin as her primary problem substance, followed by crack cocaine, Xanax and Percocet. She indicated that she had stopped using heroin and cocaine, but had commenced the use of Xanax and Percocet only two months earlier. She described herself as a "total abstainer" as far as drugs and alcohol were concerned. (Exhibit 15.)
5. EVENT'S FOLLOWING THE FILING OF THE TERMINATION PETITION ON AS TO THE OTHER CHILDREN ON MAY 17, 2000
Although substance abuse counseling sessions were scheduled to take place at FSGW on May 31, 2000, June 2 and 7, 2000, Antoinette D. failed to attend. Accordingly, FSGW determined her to be in non-compliance once again, and closed their file. (Exhibits 16a, 16c.)
Court ordered (Lopez, J.) interactional evaluations of Antoinette D. and the four older children subject to this petition were scheduled to take place with a forensic psychologist, David M. Mantell, Ph.D., on September 19, 2000. As Antoinette D. did not attend, the evaluations did not take place. (Exhibits 29, 30; Testimony of Cynthia P.)
While the court-ordered expectations prohibiting involvement with the criminal justice system were pending, Antoinette D. was subject to several prosecutions. On August 14, 2000, she was sentenced to operating a motor vehicle when her privileges were under suspension or ineffective, and received a sentence of 30 days, suspended, with one year of probation. As of October 5, 2000, she faced pending felony charges of larceny in the second degree, with misdemeanor charges of larceny in the fifth degree. (Testimony of Gerald K.)
Antoinette D. is involved with a church which she attends regularly. CT Page 4859 (Exhibit 22.)
B. DAVID SR., THE FATHER
David Sr. was born on April 1950. In 1992, he commenced working as a municipal firefighter: he was terminated from this employment following a drug-related arrest in 1996. (Exhibit 32.)
David Sr. had commenced heroin use in 1996, in the company of Antoinette D. His periodic heroin use became habitual, and he participated in a 20-day detoxification program at Eagle Hill. On August 21, 1997, David Sr. tested positive for cocaine during an evaluation for substance abuse at the Morris Foundation. Treatment was recommended by that agency, but David Sr. did not comply. (Exhibit 32.)
David Sr. visited with Andrea only inconsistently from January of 1998 through September 2000, missing more than half of the scheduled opportunities to develop a bond with his child. No observable parent-child relationship developed between Andrea and her biological father due to the lack of regular and consistent visitation and contact. (Exhibit 24.)
David Sr. had visited with Antwoine, David, Olivia and Sarah on a largely inconsistent basis during the adjudicatory periods at issue in this case. From October through late December 1999, he visited regularly with these children. However, thereafter the visits with these children were suspended pending his submission to substance abuse evaluation, hair analysis and urine screening for drugs and alcohol. (Exhibit 36.)
David Sr. did not keep DCF apprised of the status of his current employment or living arrangements, notwithstanding the existence of the expectations and specific steps requiring him to do so. He has not demonstrated that he participated in parenting counseling, nor has he participated in urine screens to determine whether he was abusing drugs. He also been involved with criminal activity, in violation of the steps and expectations, and has been incarcerated during at least a portion of the pendency of these matters. (Exhibits 24, 36.)
C. THE CHILDREN
From 1993 through January 7, 1998, David Sr. had served as the primary caretaker for Antwoine, David, Olivia and Sarah, with assistance from Antoinette D. and Antoinette's family. (Exhibit 33.) On January 22, 1998, DCF instituted a 96-hour hold based on the mother's and father's non-compliance with treatment, DCF and court orders; Antoinette D.'s recent entry into an in-patient treatment facility; and David Sr.'s incarceration which had commenced on December 29, 1997. These children CT Page 4860 have been in DCF custody, receiving foster care since that date. (Exhibit 33.)
Andrea was placed in DCF custody almost immediately following her birth in August of 1997, and she, as well, has thereafter remained in foster care. (Exhibits 24, 31, 32.) Andrea has developed a healthy relationship with her siblings, who enjoy playing with her during visits. (Exhibit 23.)
Antwoine, David, Olivia and Sarah attend church services on a regular basis with their foster parents. (Exhibit 22.)
1. ANTWOINE
Antwoine was born on November 1989. Antoinette D. had received very little prenatal care early in her pregnancy, and admitted to free basing heroin two weeks prior to his delivery. (Exhibit 25.) As noted above, David Sr. cared for Antwoine, with some assistance from Antoinette D., during the first few years of his life. From January 7, 1998 until January 22, 1998, Antwoine and his brother David resided with their maternal aunt. Antwoine has been residing in the same foster home as his brother since that date. (Exhibit 33.)
Although he had repeated two years in school prior to commencing foster care, Antwoine has adjusted quite well to his foster home and to school. He and his brother have been fully accepted by the siblings in their foster family. (Testimony of Dorothy D.) Currently in fourth grade, Antwoine participates in extra-curricular activities at the Boy's Club. (Exhibit 23.)
2. DAVID
David was born on October 1993. Antoinette D. had tested positive for cocaine and opiates on October 7, prior to her admission for labor and delivery. At birth, David tested positive for both cocaine and opiates. (Exhibit 26.) As noted above, David Sr. cared for David, with some assistance from Antoinette D., during the first few years of his life. Thereafter, he was cared for by his maternal aunt until his transfer to foster care in January of 1998.
David is in second grade, and doing very well. (Testimony of Dorothy C.) David and Antwoine, are residing together and doing well in foster care; they have asked their foster mother if she would adopt them. (Exhibit 33; Testimony of Dorothy C.)
3. OLIVIA
CT Page 4861
Olivia tested positive for cocaine and heroin at her birth on January 1995, and was found to be suffering from mild withdrawal symptoms. (Exhibit 27.) As he did for her brothers, David Sr. cared for Olivia, with some assistance from Antoinette D., during the first few years of her life.
From January 7, 1998 until January 22, 1998, Olivia and her sister Sarah resided with their maternal grandmother and then with their maternal aunt. Olivia has been residing in the same foster home as her sister since that date, when she was almost three years old. Olivia has suffered from severe asthma, and required breathing treatment 3-4 times a day, but that condition seems to be improving. (Exhibit 33; Testimony of Rubia P.) Now five years old, Olivia is bonded to the foster parents she shares with Sarah, and considers her foster mother to be her psychological parent. She has attended the Head Start program with Sarah, and is now doing very well in kindergarten. (Exhibit 22; Testimony of Rubia P.) She has no noted special needs, and has no difficulties with behavior or socializing with other children. (Testimony of Rubia P.)
4. SARA
Sarah was born on January 1996. Thereafter, with her brothers and sister, she was cared for by David Sr. with some assistance from Antoinette D., during the first few years of her life. She was cared for by her maternal grandmother and aunt until her transfer to foster care on January 22, 1998.
Since that date, when she was two years old, Sarah has lived in the same foster home as Olivia. Now, like her sister, Sarah is bonded to their foster parents, and considers her foster mother to be her psychological parent. (Exhibit 22; Testimony of Rubia P.)
5. ANDREA
As noted, Andrea tested positive for cocaine and heroin at birth on August 1997. (Exhibit 28.) Antoinette D. had not received any prenatal care for this child, and admitted to using drugs prior to her delivery. After this delivery, DCF had "initiated an Administrative 96 Hour Hold based on the long history of substance abuse by mother without adequate treatment." (Exhibit 23.) Thus, Andrea entered foster care upon discharge from the hospital where she was born, and she has remained in foster care thereafter. (Exhibits 24, 28, 31, 32.)
As a pre-schooler, Andrea had demonstrated "developmental delays in areas of Social Development, Self-Help, Fine Motor Development and CT Page 4862 Language Comprehension". Presenting with few behavioral problems, Andrea had securely bonded with her foster parents by late June of 1999, when she was evaluated by Dr. Haymes. By that date, she demonstrated scant relationship with her biological mother. (Exhibit 18.)
By September of 2000, Andrea was noted to be developmentally on target, without any difficulties except an asthmatic condition which requires the administration of a breathing treatment 3-4 times a day. (Exhibits 23, 24.) Andrea was placed with a single foster family from November of 1997 through the time of trial. Although these foster parents are not able to adopt her, she refers to them as "Mom" and "Dad". (Testimony of Yvonne C.; Exhibit 24.)
 II. ADJUDICATION
As to the adjudicatory phase of this hearing,[12] the court has considered the evidence relevant to the period following the adjudication of neglect as to Andrea on October 29, 1997 through September 9, 1999, when the amended TPR petition was filed. As to the other children, the court has considered the evidence relevant to the period following their adjudication as neglected children on March 11, 1998 through May 17, 2000, when the TPR was filed. The court has also considered evidence relevant to such other time periods as permitted by law. The court has determined that statutory grounds for termination exist.
A. LOCATION AND REUNIFICATION
With respect to the statutory element of location and reunification, required for termination pursuant to General Statutes § 17a-112 (c) (1),[13] the court finds as follows:
1. ANTOINETTE D., THE MOTHER
As noted, Antoinette D. participated in the trial of this matter, and attended all court sessions. (See also Exhibit 21.) With regard to Andrea, the court is not obligated to assess reunification attempts, as it had been determined at a hearing on October 28, 1998 before the court (Holden, J.) that such efforts were not appropriate as to Antoinette D.
As to Antwoine, David, Olivia, Sarah and Andrea, the court finds, from the clear and convincing evidence, that DCF made reasonable reunification efforts concerning this mother and all of the children who are subject to these TPR petitions, both prior to and following the filing of the applicable termination petitions. The breadth and extent of these efforts became apparent through the evidence concerning the multiple counseling and family therapy services offered to Antoinette D. over the three years CT Page 4863 which followed Andrea's placement with DCF. These efforts included the provision of caseworker assistance and references to multiple service providers as described in Part I. A., above, and were reasonably appropriate in the face of Antoinette D.'s need for assistance with parenting, lifestyle and substance abuse issues.[14] Such efforts were, however, fatally hampered by Antoinette D.'s persistent denial that she required drug treatment, and her failure to undergo periodic assays to measure her drug use or establish her abstinence. In re Sheila J.,62 Conn. App. 470, 479, ___ A.2d ___ (2001). Antoinette D.'s fundamental lack of participation and cooperation with both DCF and the counseling and drug treatment provided leads this court to conclude that she was unable or unwilling to benefit from the proffered reunification services. See In re Amelia W., 62 Conn. App. 500, 502-503, ___ A.2d ___ (2001).
Furthermore, it should be noted that DCF has spoken with family members, including the maternal grandmother, paternal aunt and maternal aunt,[15] but that these individuals have not specifically requested consideration as a placement resource for Andrea or the other children. While the maternal grandmother has previously refused to allow DCF into her home and has indicated that she did not want the children, she called DCF in mid-2000, inquiring about the status of the children and their placement. A paternal aunt, Carolyn J., was also considered by DCF as a placement resource.[16] (Exhibit 33; Testimony of Cynthia P.)
2. DAVID SR., THE FATHER
As discussed, David Sr. attended the court session on December 11, 2000, and consented to the termination of his paternal rights affecting these children on December 12, 2000.[17]
B. STATUTORY GROUNDS FOR TERMINATION — ANTOINETTE D.
With respect to the statutory grounds for termination of parental rights, the court finds the following to have been established by clear and convincing evidence:
1. ABANDONMENT — § 17a-112 (c)(3)(A)
The petitioner claims that the statutory ground of abandonment exists between the mother and each of the children subject to these petitions, within the meaning of General Statutes § 17a-112 (c)(3)(A).[18]
Based on the clear and convincing evidence presented in this matter, as discussed below, the court finds that the petitioner has proved that as to all five of her children, Antoinette D. has, at best, displayed during the adjudicatory period an interest that is merely sporadic in nature, CT Page 4864 but that does not exist on a consistent and continuing basis. See In reMigdalia M., 6 Conn. App. 194, 210, 504 A.2d 533, cert. denied,199 Conn. 809, 508 A.2d 770 (1986); In re Shane P., 58 Conn. App. 244,256, ___ A.2d ___ (2000); see also In re Deana E., 61 Conn. App. 185,193, 194, ___ A.2d ___ (2000). Accordingly, the court finds this issue in favor of the petitioner.
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes 17a-112 (b)(1) [now § 17a-112 (c)(3)(A)] defines abandonment as the fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. (Citations omitted; internal quotation marks omitted.) In re Kezia M., 33 Conn. App. 12, 17-18,632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993)." (Quotation marks omitted.) In re Deana E., supra, 61 Conn. App. 193.
a. As TO ANTWOINE, DAVID, OLIVIA, AND SARAH
The clear and convincing evidence in this case establishes that Antoinette D. has shown an essential lack of interest in Antwoine, David, Olivia and Sarah during the relevant period of March 11, 1998 through May 17, 2000. From January 1998 through September 1998, Antoinette D. missed 28 scheduled visits with these children. From September 1998 through January 19, 1999, she visited them consistently, but continued to have inappropriate conversations with them, including complaining to the children about their physical appearance. Such disparaging comments were especially upsetting to Antwoine and David, the older children. (Exhibit 35.)
Following her positive drug test in late December 1999, Antoinette D. has not visited Antwoine or David. (Testimony of Dorothy C.) She inquired once about their status in March of 2000 by contacting DCF, but then had no contact with the agency through the following May. She has not contacted Antwoine's and David's foster family for information concerning CT Page 4865 their well-being, and has sent no birthday cards or other correspondence for the boys.[19] (Testimony of Dorothy C., Cynthia P.; Exhibit 22.)
Antoinette D. called the foster home to speak to Olivia on her birthday in January 2000, but has not had any other phone contact of note with her older daughters. Other than a visit with these girls on the January 2000 New Year holiday, she has not come to the foster home or otherwise communicated with the foster family to become informed as to their progress. Antoinette D. has not sent these children any cards, gifts, mementos or other correspondence. (Testimony of Rubia P., Cynthia P.; Exhibit 22.)
Antoinette D. has failed to appropriately use DCF as a means of communicating with her children, or of obtaining information about them, further establishing her lack of interest in them. Commencing with DCF's removal of the older children in January of 1998, Antoinette D. commenced a practice of irregular and unpredictable contacts with the agency. She has provided DCF with inconsistent and inaccurate information concerning her address, and has failed to respond to numerous letters from that agency concerning her children. She has missed a substantial number of the Administrative Case Reviews at which information concerning the children's status was scheduled to be shared with her. (Exhibit 22.) Prior to January of 2000, Antoinette D.'s communication with DCF was sporadic: following March of 2000, her communications became extremely inconsistent and thus interfered with the visitation opportunities available to her.[20] (Testimony of Cynthia P.)
Our courts have recognized that abandonment may be established in a case such as this, where a parent has evinced some, but only minimal interest in her children, or where a parent's drug use and lack of availability have adversely affected a parent's ability to demonstrate such interest. See In re John G., 56 Conn. App. 12, 21-22, 740 A.2d 496
(1999); In re Roshawn R., 51 Conn. App. 44, 53-54, 720 A.2d 1112 (1998). See also In re Migdalia M., supra, 6 Conn. App. 210; In re Shane P., supra, 58 Conn. App. 256; see also In re Deana E., supra,61 Conn. App. 193, 194. Utilizing those standards, the court finds, by clear and convincing evidence, that the petitioner has met her burden of proving abandonment as contemplated by § 17a-112 (c)(3)(A).
b. AS TO ANDREA
The clear and convincing evidence in this case establishes that Antoinette D. has also shown little interest in Andrea at any phase of her life. Antoinette D. failed to visit her during the first seven months of her life, and did not even inquire about visitation with the infant until January 21, 1998. (Exhibits 32, 33, 34.) Her first post-hospital CT Page 4866 visit with this child took place on March 4, 1998. Visits thereafter occurred only inconsistently. (Exhibit 34.) Visitation with Andrea was suspended in January 2000, due to Antoinette D.'s positive results on the December 1999 drug testing, and to her failure to cooperate with additional screening for substance abuse. (Exhibit 24.) Effectively, Antoinette D. has not visited with Andrea since December 17, 1999. (Exhibit 23.)
Overall, Antoinette D. has visited with Andrea, on average, less than twice per month from March 1998, through the filing of the amended TPR petition. The respondent mother has never sent any correspondence, cards or mementos to her youngest child. She failed to attend 3 out of 5 Administrative Case Reviews held on the child's behalf. (Exhibits 23, 24; Testimony of Yvonne C.) Antoinette D. has never visited Andrea at her foster home, and she has never called or otherwise communicated with Andrea or her foster mother.[21] (Testimony of Cynthia P., Yvonne C.)
Here, as well, the evidence clearly and convincingly establishes that any interest Antoinette D. has displayed toward her youngest daughter has been sporadic in nature, and did not exist on a consistent and continuing basis from October 29, 1997 through September 9, 1999. See In re MigdaliaM., supra, 6 Conn. App. 210; In re Shane P., supra, 58 Conn. App. 256; see also In re Deana E., supra, 61 Conn. App. 193, 194; In re John G., supra, 56 Conn. App. 21-22; In re Roshawn R., supra, 51 Conn. App. 53-54. Accordingly, pursuant to the legal standards set forth above, the court finds by clear and convincing evidence that Antoinette D. has abandoned Andrea, within the meaning of § 17a-112 (c)(3)(A).
2. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (c)(3)(B)
The petitioner also claims that the statutory ground of parental failure to rehabilitate exists in this case, supporting termination of Antoinette D.'s parental rights pursuant to General Statutes § 17a-112
(c)(3)(B).[22] While Antoinette D. has partially attended to some of the court-ordered expectations, the overwhelming evidence establishes that as of September 9, 1999, the TPR date affecting Andrea, and as of May 17, 2000, the TPR date affecting the other children, she had neither accomplished such personal rehabilitation as is contemplated by §17a-112 (c)(3)(B), nor had she achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in the lives of her offspring. See In re Amy H., 56 Conn. App. 55,60, 742 A.2d 372 (1999). Accordingly, the court finds this issue in favor of the petitioner.
"`Personal rehabilitation as used in the statute refers to the CT Page 4867 restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999).]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In re Shyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165
(1999)]." In re Sarah Ann K., 57 Conn. App. 441, 448, ___ A.2d ___ (2000). See also In re Ashley S., 61 Conn. App. 658, 665, ___ A.2d ___ (2001). In this adjudicatory phase, the court has properly relied "on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether thedegree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time. See Inre Amber B., 56 Conn. App. 776, 785, 746 A.2d 222 (2000); see also In reSarah M., 19 Conn. App. 371, 377, 562 A.2d 566 (1989)." (Emphasis in the original.) In re Stanley D., 61 Conn. App. 224, 230, ___ A.2d ___ (2000).
Antoinette D.'s entrenched pattern of polysubstance abuse is made tragically apparent through the evidence establishing that historically, Antwoine, David, Olivia and Andrea were each exposed to illegal drugs in utero. The current relevant issue for this court, however, is whether Antoinette D. achieved rehabilitation from her substance abuse problems during the period of October 29, 1997 through September 9, 1999, as far as Andrea is concerned; and from March 11, 1998 through May 17, 2000 with regard to Antwoine, David, Olivia and Sarah, and whether she has thereafter become functionally better able to resume the responsibilities of parenting these children. In re Hector L., supra, 53 Conn. App. 367. For clarity and convenience, the court will discuss jointly the factual basis for the decisions affecting each period of time.
Antoinette D.'s history of repeated and unsuccessful attempts at gaining control over her drug habit is described in Part I. A., above. She had commenced out-patient therapy at Connecticut Counseling in the spring of 1995, but attended treatment only for a limited period of time. (Exhibit 5.) Substance abuse and parenting rehabilitation services were available to her by DCF as early as August of 1997, when she presented CT Page 4868 for evaluation at the Morris Foundation. In diagnosing her opioid dependence at that time, it was noted that while Antoinette D. reported a two year period of sobriety, she was visibly "emaciated and her hygiene and appearance upkeep were minimal," and that she otherwise displayed signs that, in fact, her "heroin habit exceeds her reported two bag per day habit. She alluded to an increasing tolerance to heroin, displayed chronic withdrawal symptoms as noted by reported nausea, joint pain, and visible body shakes, and her preoccupation with her habit with no regard to herself, her children, or their future together." (Exhibit 6). In addition to her unreliable performance as a historian, Antoinette's weaknesses were found at that time to include her ominous "minimization of her substance abuse and its consequences. . . ." (Exhibit 6).
Despite her obvious need for substance abuse treatment, Antoinette D. failed to follow through in a timely manner with DCF's consequent referrals to Merritt Hall or Meridian Hills. She instead continued to use drugs until her admission to Eagle Hill for detoxification in January of 1998. (Exhibits 7, 23.) Although she persisted in denying her addiction and her need for treatment during the early part of the inpatient care that followed, she completed a series of drug abuse programs at the Morris Foundation and McCall's Carnes Weekes facility, and was ostensibly compliant through early September 1998. (Exhibits 8, 9, 15, 23, 33, 34.)
Unfortunately, the evidence further discloses that approximately one year after her discharge from in-patient care in the fall of 1998, Antoinette D. relapsed, and exposed herself to the cocaine, morphine and codeine which manifested itself through the positive drug tests performed on December 21, 1999, shortly after the amended TPR petition for Andrea was filed. This relapse no doubt caused or contributed to her failure to respond to requests and directives for additional substance abuse testing, and to her lack of cooperation with the renewed efforts at obtaining a psychological evaluation. (Exhibits 23, 36.) Antoinette D. again required detoxification as the result of her persistent use of illegal drugs, and received treatment through ABH, followed by temporary residential care at the Morris Foundation and SCRC, during late 1999 and early 2000. (Exhibits 12, 13.) This recurrent relapsing behavior is consistent with chronic, unrelenting substance abuse and with Antoinette D.'s lifestyle that prioritized drug use over all other matters, including her children, whenever she was unsupervised during the relevant adjudicatory periods. (See Exhibit 6.)
Further indication of the respondent mother's lack of rehabilitation is evident through her failure to comply with the recommended substance-abuse after-care regimen. Antoinette D. vehemently denies the accuracy of test results which indicate that she has again used drugs, denies that she still requires substance abuse treatment, and has not CT Page 4869 effectively pursued necessary therapy. (Exhibit 36.) She clearly failed to follow DCF's requests for participation in substance abuse evaluations following the positive test results of December 1999. (Exhibit 23.) She has chronically minimized her drug use,[23] and continually blames others for her dilemma.[24] She has not maintained appropriate contact with counseling providers, despite the additional supportive treatment that had been provided at ABH, Morris and SCRC during the months immediately prior to the submission of the TPR petitions for her older children on May 17, 2000. (Testimony of Cynthia P.; Exhibits 11, 12, 14, 15, 16.) Although Antoinette D. was informed of the need for additional substance abuse treatment through her FSGW assessments in both March and May of 2000, she inappropriately failed to respond to that agency's entreaties for attendance at treatment sessions, leading to the cessation of services once again. (Exhibits 15, 16a, 16b, 16c.) Such lack of cooperation with follow-up care is not indicative of rehabilitation, but of either chronic and refractory substance abuse, or willful disincentive to participate in meaningful management of that problem.
DCF has admitted that Antoinette D. has the ability to manage her drug problem relatively well, under highly supervised situations. (Testimony of Cynthia P.) Antoinette D.'s stay at McCall's facilities, after her detoxification during the winter of 1998 through the following September, indeed reflects that while she is participating in a residential treatment program, she is capable of maintaining a rigorous routine of twelve-step meetings and self-imposed abstinence. (Exhibit 9.) The evidence is equally clear, however, that when Antoinette D. is not
involved in a highly structured therapeutic program, she has been unable to control her substance abuse. Her situation thus illustrates the principle that apparent freedom from drug abuse, on a temporary basis, and even following residential treatment, does not conclusively establish rehabilitation within the meaning of § 17a-112 (c)(3)(B). In reMichael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000).
As described in Part I. A., above, the evidence in this case clearly and convincingly indicates that Antoinette D. has not met the most significant expectations set by the court to measure and help define her rehabilitation. (Exhibit 22.) She has failed to respond to DCF's offers of visitation adjustments, and failed to adequately maintain contact with DCF or to inform the agency of her whereabouts, as required by the specific steps. (Exhibits 1, 2, 3, 19, 20, 21; Testimony of Cynthia P.) She has been not only arrested but convicted of violating the law, becoming involved with the criminal justice system when she had been prohibited from doing so. (Testimony of Gerald K.) She has failed to follow the court's expectations regarding compliance with orders for evaluations, and failed even to exhibit the minimal elements of cooperation which would have been demonstrated through her attendance at CT Page 4870 scheduled sessions with the psychologists Dr. Sadler and Dr. Mantell. (Exhibits 29, 30, 36.)
Antoinette D.'s lackluster record of compliance with these non-treatment related court expectations further supports the conclusion that she has failed to achieve such a degree of rehabilitation that would likely enable her to assume a responsible parenting position for her five young children within a reasonably foreseeable time. § 17a-112 (c) (3)(B). In re Stanley D., supra, 61 Conn. App. 230; In re Sarah Ann K., supra, 57 Conn. App. 448; In re Amber B., supra, 56 Conn. App. 785. Almost two years transpired between the October 1997 neglect adjudication for Andrea and the September 1999 filing of the TPR petition affecting this child; another eight months passed before the TPR petitions regarding the older children were submitted in May of 2000; and many additional months transpired before the evidence was completed in this case.[25] Id. While as an in-patient during this period, Antoinette D. demonstrated some improvements in her substance abuse, housing and stability issues, showing some ability to modify her life in a positive fashion, "[a]lthough commendable, those improvements are not dispositive on the issue of [her] ability to care for [Antwoine, David, Olivia, Sarah and Andrea]." In re Stanley D., supra, 61 Conn. App. 233. Under the totality of the circumstances of this case, this court cannot reasonably conclude that Antoinette D., who has persisted in drug use and who has failed to maintain a stable residence or lifestyle for herself during this prolonged period, is inherently capable of or willing to achieve a degree of rehabilitation sufficient to support a forecast that she may resume a useful role in the children's lives within a reasonable time. See In re Stanley D., supra, 61 Conn. App. 230; In re Eden F., supra,250 Conn. 706.
"At the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of the child's commitment." (Citation omitted; footnote omitted). In re Hector L.,53 Conn. App. 359, 367, 730 A.2d 106 (1999). The clear and convincing evidence in this case establishes that the level of any rehabilitation reached by Antoinette D. falls far short of that which would reasonably encourage a belief that at some future date, sufficiently related to the ages and needs of her children, she could assume a responsible position in the lives of Antwoine, David, Sarah, Olivia or Andrea. By any measure, Antoinette D. was scarcely better able to resume the responsibilities of parenting at the time of the filing of the amended TPR petitions on September 9, 1999 as to Andrea, and the filing of the TPR petitions on May 17, 2000 as to the remaining children, than she was at the time of the commitments on October 29, 1997 as to Andrea, and CT Page 4871 March 11, 1998 as to the older children, despite her intermittent periods of sobriety. In re Hector L., supra, 53 Conn. App. 367.
Despite the passage of additional time, Antoinette D. has yet failed to achieve a degree of rehabilitation appropriate for the provision of parenting services, with or without ancillary support.[26] In reaching this conclusion, the court "has considered the fact that the respondent had made some progress in recovering from drug abuse and in improving her parenting skills. . . those efforts were too little and too late." (Quotation marks omitted.) In re Sheila J., 62 Conn. App. 480-481, ___ A.2d ___ (2001). Here, as in Sheila J., the petitioner has well met her burden of proof on the ground of parental failure to rehabilitate, § 17a-112 (c)(3)(B).
3. NO ONGOING PARENT-CHILD RELATIONSHIP (ANDREA) — § 17a-112(c)(3)(D)
The petitioner further claims that lack of an ongoing parent-child relationship between Antoinette D. and Andrea warrants termination of parental rights pursuant to § 17a-112 (c)(3)(D).[27] The relevant clear and convincing evidence establishes that during the period between October 27, 1998 and March 15, 1999, and even through September 9, 1999 when the amended TPR petition was filed, no relationship existed between Antoinette D. and her daughter of the type that ordinarily develops as a result of a parent having met a child's needs on a day-to-day basis. To allow further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to this child's best interests. Accordingly, the court finds this issue in favor of the petitioner.
In determining whether a parent-child relationship existed in this case, the court has acknowledged that § 17a-112 (c)(3)(D) contemplates "a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G., supra, 56 Conn. App. 22. "Furthermore, where a child who is able to express herself is concerned, the court must give great weight to the feelings of that child in determining whether an ongoing parent-child relationship exists. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. (Citations omitted; internal quotation marks omitted.) In re Tabitha T., 51 Conn. App. 595, 602, 722 A.2d 1232
(1999)." In re Shane P., 58 Conn. App. 234, 240, A.2d (2000); see also Inre John G., supra, 56 Conn. App. 22-23. Therefore, when ascertaining the presence or absence of such an ongoing relationship, it is appropriate for CT Page 4872 the court to consider whether a child refers to a respondent as a parent, has memories of a parental relationship with the respondent, or whether a child knows a respondent as he should know a parent. In reShane P., supra, 58 Conn. App. 240.
a. ABSENCE OF A PARENT-CHILD RELATIONSHIP
The clear and convincing evidence discussed above, taken in its entirety, discloses that Antoinette D. has never "met on a day to day basis the physical, emotional, moral and educational needs" of her youngest child. § 17a-112 (c)(3)(D). Andrea was born on August 1, 1997; upon discharge from the hospital, she was removed from her mother's care pursuant to the OTC order of August 7, 1997, on which date DCF also filed a neglect petition. Andrea remained in DCF care through the finding of neglect on October 29, 1997, and through the filing of the original TPR petition on March 15, 1999 and its amendment on September 9, 1999, and through the time of trial.
Significantly, there is no evidence in this matter from which the court could reasonably infer that Antoinette D. had ever attempted to meet Andrea's daily needs at any time during the relevant adjudicatory period. In this case, as noted in Part II. B. 1. b., above, Antoinette D. showed absolutely no interest in this child during the first seven months of her life. She did not visit the child to assist in her emotional and moral growth; she made no effort to provide Andrea with clothing, housing, food or shelter to help meet her physical needs; she did not communicate with the child or her custodians in an effort to assist in her education. Instead, Antoinette D. left all of these responsibilities to others who were, in fact, establishing an ongoing parenting relationship with her child.
Then, after a seven-month absence following Andrea's birth, Antoinette D. began to express some interest in this child. She visited with her on an irregular and inconsistent basis commencing in March of 1998, but never availed herself of a consequential portion of the opportunities for contact with Andrea that were offered by DCF. (Exhibits 23, 24, 34.) The evidence supports the clear inference that even when Antoinette D. did visit with Andrea, she never acted in a way commensurate with acknowledgment of her responsibility for the child's physical, emotional, moral and educational needs.[28] The result has been that Andrea does not know Antoinette D. as her mother; has no memories of a parental relationship with her; and refers to her as "Toni," reserving conventional maternal attributions for her foster mother, with whom shehas developed an ongoing parent-child relationship. See In re Shane P., supra 58 Conn. App. 240. Thus, no parent-child relationship has ever developed between this mother and her child, and the elements of § CT Page 487317a-112 (c)(B)(D) have been proved by the clear and convincing evidence in this case.
However, because Andrea was removed from her mother's care shortly afterbirth, it may be argued that under the facts of this case, Antoinette D. never was given a chance to attend to her daughter's needs on a daily basis, as contemplated by § 17a-112 (c)(3)(D). Therefore, the court is also called upon to determine whether these circumstances effectively bar the petitioner's claim that no ongoing parent-child relationship exists between this mother and her child.
At first glance, it might appear that this issue was conclusively resolved by In re Valerie D., 223 Conn. 492, 499, 613 A.2d 748 (1992). Like the present case, Valerie D. examined the limited opportunities for forming a parenting relationship that are available to a mother who has lost custody of her newborn due to in utero exposure to cocaine. Id., 500-504, 506, 508, 509. The parental rights in that case were terminated a mere three and one-half months after the infant's birth and placement with DCF. Under the specifically determined facts of Valerie D., the Supreme Court found that custodial foster care had eviscerated the mother's reasonable and obvious efforts to develop an appropriate parenting relationship, and vacated the order which terminated parental rights.[29] Id., 533. Too broadly read, Valerie D. might suggest thatany placement of a newborn with DCF, immediately after birth, fatally interferes with the development of an ongoing parent-child relationship, and thus eliminates the petitioner's opportunity for subsequent reliance upon § 17a-112 (c)(3)(D).
The lessons of Valerie D., are more limited in scope, however, and provide no succor for Antoinette D. Valerie D. presents multiple, compelling factual circumstances supporting the conclusion that DCF's early intervention in that child's life had, in and of itself served as the death knell for that respondent mother's efforts to develop a parenting relationship with her child. Those circumstances are absent in the present case, where Antoinette D. s own inattentiveness to her child clearly and convincingly served to cause, allow and permit the lack of a parent-child relationship to be established with Andrea.
There are several critical aspects of Valerie D. which are fundamentally inapposite to the case at bar, and which effectively restrict its application to other, more factually similar matters.[30]
First, Valerie D. specifically address the procedural conundrum created by DCF when a neglect petition and a coterminous TPR petition are filed during the first days of an infant's life, and both petitions are adjudicated against the respondent parent within a few months thereafter. In re Valerie D., supra, 223 Conn. 532, 541-42. Under such CT Page 4874 circumstances, a biological mother would have woefully little time to demonstrate her capacity to meet the daily physical, emotional, moral and or educational needs of the child.[31] Such fundamental unfairness is not present in the instant matter, as although the neglect petition for Andrea was filed within days of her birth, and the neglect adjudicated some three months later, Antoinette D. had over two and a half years thereafter within which to demonstrate her ability or willingness to serve as a parent for this child, before the initial TPR petition was filed on March 15, 1999, and like time within which to work at developing an emotional relationship with her. She was provided with another six month period to achieve the goal of developing such a relationship with Andrea, prior to the submission of the amended TPR petition on September 9, 1999, newly adding the claimed lack of an ongoing parent-child relationship. The clear and convincing evidence in this case reflects, as noted, that Antoinette D. did not manifest a valid commitment to this child, notwithstanding the lengthy applicable adjudicatory period.
A second critical element of Valerie D., not present in Andrea's case, is the value of the biological mother's determined pattern of visitation, which clearly showed interest in and attention to her infant. In Valerie D., the respondent mother was found to have made relatively timely, persistent and consistent efforts to visit with her child while it was in DCF custody during the brief period following birth, prior to the TPR adjudication.[32] In re Valerie D., supra,223 Conn. 528-29. Such visitation, competent to demonstrate the mother's devotion to and affection for a newborn, and serving as a predicate to her development of a parent-child relationship, was markedly absent from the instant matter. Here, in contrast, Antoinette D. neither requested nor obtained any interaction with Andrea after losing custody soon after her birth; failed to visit with her child during the first seven months of her life and failed even to meet with or contact her infant for months at a time; visited only inconsistently from March 4, 1998 through the date when the amended TPR petition was submitted. See Part II. B. 1. b., above. Such minimal attempts to visit with baby Andrea do not favorably compare to the worthwhile efforts made by Valerie's mother, who at least attempted to develop a parenting relationship with her infant notwithstanding the prominent role of DCF in that child's very young life.
A third critical limitation on Valerie D. is related to the age of the baby who was the subject of that litigation, and her concomitant inability to express or demonstrate her feelings about her biological mother. Valerie D. was the subject of a TPR hearing during the earliest phases of her chronological and emotional development, and she was therefore unable to show, during the adjudicatory period, whether she had formed a relationship with her mother. In re Valerie D., supra, CT Page 4875223 Conn. 232. As a result, the court intentionally focused its inquiry "not on the feelings of the infant, but on the positive feelings of the natural parent."[33] Id. From this vantage point, the mother's desire for reunification was predominate. In the present case, however, Andrea was able to demonstrate some chronological and emotional maturity during the passage of the adjudicatory period, which extended from the neglect finding made when she was almost three months old; through the filing of the original TPR petition when she was a toddler at nineteen months old, and through the filing of the amended TPR petition when she was just over two years old. (Exhibits 18, 23, 24.) This court is, accordingly, not bound by the "focus. . . . on the positive feelings of the natural parent" relied upon in Valerie D., but must properly pay heed to the feelings of the child, as well. See In re Shane P., supra,58 Conn. App. 240.
The inherent value of the emotional feelings and ties of a verbally expressive child was recently confirmed by the Appellate Court in ShaneP., supra. Shane, who suffered from significant developmental disabilities, had been committed to DCF and provided with foster care commencing at three months of age. His biological mother then visited him a few times, became incarcerated, and six months later recommended monthly visits facilitated by DCF. In re Shane P., supra,58 Conn. App. 239, 241. In concluding the respondent did not have a valid ongoing parent-child relationship with Shane, within the meaning of General Statutes § 17a-112 (c)(3)(D) (Rev, to 1997), the Appellate Court focused upon the child and his feelings for his mother, rather than concentrating upon the mother's feelings for child, as had occurred inValerie D. See In re Valerie D., supra, 223 Conn. 232. The Shane P. court emphasized that where such feelings can be ascertained, "[i]n considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance." (Emphasis added; footnote omitted.)In re Valerie D., supra, 223 Conn. 532. Id., 240. The calculus to be applied by the court must include assessment of whether the child has any present memories or feelings for the respondent parent. Id.
In Shane P., the court acknowledged that the child at issue had no present memories of or feelings for his biological mother, although he did warm to her when visiting her in prison; the child did not refer to the respondent as his mother and had no memories of any maternal relationship with her; the child referred to his foster mother as his mother; and the child did not know her as he should know his mother. Id., 240-241. Such feelings on Shane's part are quite similar to those of Andrea with regard to Antoinette D.: as described above, she has no present memories of the respondent serving in any maternal role; does not refer to her as her mother; and does not know her as she should know her mother; although she does not "warm" to Antoinette D. at her visits, as Shane did to his CT Page 4876 mother, but seems to merely tolerate her. (Exhibit 18.) Using this ShaneP. analysis in the present case, the court concludes that the state has met, by clear and convincing evidence, its burden of proving the lack of an ongoing parent-child relationship between Antoinette D. and her youngest child.
The evidence in this case clearly and convincingly established both that Andrea had no positive feelings or affirmative emotional relationship with Antoinette D. during the adjudicatory period, and that she was able to exhibit this status to others. This conclusion is well-supported by the Dr. Haymes's assessment of the interaction between Antoinette D. and Andrea in mid-1999, and the resulting opinions he voiced in his report, represented in Exhibit 18.[34] The psychologist noted that Andrea appeared "grim, tense and unhappy" during her meeting with her mother, despite Antoinette D.'s reasonable efforts at engaging the child in communications or games. As Dr. Haymes observed, while Andrea was able to demonstrate her affection for DCF workers by holding out her arms to them, Andrea had to be coaxed into making physical contact with Antoinette D. When she had overcome her initial hesitancy to go into her mother's arms, the child remained both physically and verbally unresponsive to her mother. Andrea neither laughed nor cried in her mother's presence, showing no joy, although displaying no fear. Antoinette D. was unsuccessful in eliciting any positive reaction from Andrea, despite her efforts at play activities and conversations. At the end of the session, the psychologist noted that Andrea "had no problem parting from her mother," behavior that would be inconsistent with that of a young child who is fond of or interested in Antoinette D. (Exhibit 18.) The clear inference from this observation, and the court's review of Dr. Haymes's report, is that during the summer of 1999, prior to the submission of the amended TPR petition, Andrea had eloquently demonstrated that she had no positive feelings whatsoever for her biological mother.
Antoinette D. has argued that her lack of an on-going relationship with Andrea was caused by DCF's provision of inadequate services and options for resolution of her problems. Here, as in Shane P., such argument must be rejected. "Here, the respondent's behavior, not the conduct of the department, prevented the development of a relationship with [Andrea]."In re Amelia W., supra, 62 Conn. App. 506. In the present case, the respondent mother has been largely at liberty, and has been offered multiple appropriate services, as set forth in Parts I. A., II. B. 2., above and Part III. A. 1., below, as part of the agency's reasonable efforts to help her develop a meaningful relationship with her daughter. Instead of fully utilizing these services, and achieving control over her substance abuse issues, she lapsed into non-compliance for months at a time. See II. B. 2., above. Furthermore, Antoinette D.'s record of CT Page 4877 visitations with Andrea, taken as a whole, is quite poor, and clearly and convincingly evinces a lack of developing a parent child relationship with this child. See Part II. A., above. As in Shane P., the result of the respondent's conduct is that this child has no present feelings for or memories of her in a maternal role, and that she views her current foster mother as her mother. In re Shane P., supra,58 Conn. App. 241.[35]
The clear and convincing evidence thus establishes that as the result of her persistent substance abuse and failure to obtain the full value of the services provided by DCF, and due to Antoinette D.'s inconsistent pattern of visitation commencing immediately after Andrea's birth, no positive emotional aspects of a relationship between Andrea and her biological mother were fostered, and no such relationship existed at the time of the filing of either the first or the amended TPR petition. "[T]herefore, there is no ongoing parent-child relationship" between this mother and her child. In re Amelia W., supra, 62 Conn. App. 507. Under the totality of these circumstances, the court finds that the petitioner has fulfilled its burden of proof under § 17a-112 (c)(3)(D).
b. FURTHER TIME FOR DEVELOPMENT OF THE PARENT-CHILD RELATIONSHIP
The court next turns to the question of whether allowing further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to this child's best interests in sustaining her healthy growth, development, well-being, and stable living arrangements. See In re Shyina B., 58 Conn. App. 159, 167, 752 A.2d 1139
(2000). As also discussed in Part III, below, to allow further time for the establishment a parent-child relationship between Antoinette D. and Andrea would be detrimental to the best interests of the child. Accordingly, the court finds this issue in favor of the petitioner.
Like all children her age, Andrea needs permanency. There has been no evidence presented in this case from which the court could reasonably ascertain that Antoinette D. is capable of developing the ability to parent this child, and no evidence from which the court could conclude that such ability would likely be developed within a reasonable period of time. (See Exhibit 18.) Andrea has been in foster care since birth, a total period of more than three years. Never, during this period, has Andrea manifested either an emotional bond or a parent-child relationship with her biological mother. (Exhibit 34.) Even as she passed from infancy into her pre-school years, Andrea has not sought comfort or affection from Antoinette D. She does not recognize Antoinette D. as her mother, and she does not ask for or talk about Antoinette D. in any context. (Exhibit 23.) Continuing a nominal legal relationship between the respondent mother and Andrea could well result in the development of CT Page 4878 confusion and uncertainty as to who is responsible for providing her with maternal and other parenting services, as her cognitive skills develop with time, and she becomes more independent in her thinking.
At the most fundamental level, insufficient evidence was submitted in this case to support a reasonable conclusion that Antoinette D. is committed to the development of a relationship with her youngest child. In the absence of such a demonstrated commitment, and in the presence of extant substance abuse issues and the acknowledged failure for her to become rehabilitated, no reasonable basis exists for concluding that it would be in the best interests of this child to invest any further time for the establishment of a parent-child relationship with Antoinette D. The risk benefit analysis must be viewed from the perspective of this very young child, whose interests lie in the prompt assignment of permanent parenting bonds, not in the expenditure of the precious resources of her pre-school years while waiting for Antoinette D. to become fully vested in the obligation to provide valid and reliable parenting services for this child, and to show that she is, as well, willing and able to do so.[36] Andrea has waited too many years, already, for the permanence she so surely deserves.
The two people whom Andrea has recognized as her psychological parents are her foster mother and father. She calls them "Mom" and "Dad", or "mommy" and "daddy". (Testimony of Yvonne C., Exhibit 24.) She has progressed quite well in their home, and is likely to continue to thrive if placed in a similarly stable environment, with an intact parenting structure, surrounded by consistently provided love, attention, and tangible supports. It is vitally important, now and in the future, that Andrea be enabled to view her sisters, and her brothers, as stable fixtures in her life. As discussed in Part III. B., below, this can best be achieved by allowing Andrea to live in a stable and secure environment, such as that provided by her foster parents, rather than by redirecting her to the unstable and unpredictable lifestyle that has for so long been maintained by her biological mother.
Therefore, as to the petitioner's claims brought pursuant to §17a-112 (c)(3)(D), the court finds that the lack of an ongoing parent-child relationship was a direct result of the respondent-mother's conduct rather than any state action, and concludes that the petitioner has proved, by clear and convincing evidence, an absence of an ongoing parent-child relationship between Antoinette D. and Andrea within the meaning of this statutory provision.
 III. DISPOSITION
As to the dispositional phase of this hearing,[37] the court has CT Page 4879 considered the evidence and testimony related to circumstances and events up to and including December 13, 2000, the date upon which the evidence in this matter was concluded.
A. SEVEN STATUTORY FINDINGS
The seven written factual findings required by General Statutes §17a-112 (d)[38] are recorded below. See In re Tyscheika H.,61 Conn. App. 19, 26, 762 A.2d 916 ("the court is mandated to consider and make written findings regarding seven factors delineated in §17a-112 (d)"). The court has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.[39]
 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112 (d)(1)
The court finds by clear and convincing evidence that appropriate and timely services have been made available by DCF to facilitate the reunion of the child with her mother, including: referrals to substance abuse treatment at Merritt Hall, the Meridian Hills program, Connecticut Counseling, SCRC, the Morris Foundation, the Women and Children's Program and Therapeutic Shelter, the McCall Foundation Carnes Weeks facility, McHall House half-way house and the Joseph Center; provision of a Physical Health Nurse through New Beginnings; referral to individual counseling through FSGW; transportation to court commitments and visitations; scheduling of substance abuse evaluations, testing and counseling; case management services and the proffer of family reunification services through Boys Village. (Exhibits 22, 35; Testimony of Cynthia P.)
2. REASONABLE EFFORTS AT REUNIFICATION — § 17a-112 (d)(2)
As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, this court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the five children and Antoinette D., given the situation and circumstances, given this respondent mother's unavailability, her persisting problems in rehabilitation and her failure to comply with designated service providers. The court notes that DCF has offered and provided services as outlined above, and as more specifically referenced at trial and through the Social Studies and amended Social Studies. Exhibits 22, 23, 32, 33. The court finds that the action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and to secure permanent placement for children such as Antwoine, David, Olivia, Sarah and Andrea, who are CT Page 4880 in foster care.
3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (d)(3)
As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order, the court finds reasonable and realistic expectations and steps were ordered as to the respondent mother in order to facilitate reunification, as described in Part I. A., above, and through the social study exhibits. While Antoinette D. has complied with these orders in some respects, the court further finds by clear and convincing evidence that she failed to adequately and timely comply with steps and expectations intrinsically related to resolving her substance abuse issues, and developing her parenting skills. She did complete a parenting class at the Morris Foundation in February of 1998. (Exhibit 35.) However, she has failed to adequately address the issues of personal and parental responsibility, including consistent maintenance of appropriate housing and income, in a meaningful way despite the multiple services offered to her. (Testimony of Cynthia P.; Exhibit 18.)
Antoinette D. has failed to cooperate with DCF or with the court in attending psychological evaluations as ordered. Despite DCF's thorough instructions and offers of transportation, Antoinette D. arrived one hour and twenty minutes late for the scheduled court ordered evaluation by Dr. Sadler on December 1, 1999, which resulted in the cancellation of this session. (Exhibit 36.) She did not appear as scheduled for the examination which was to be performed by Dr. Mantell on September 19, 2000, and this evaluation did not take place, either. (Exhibits 29, 30.) Antoinette D. has not completed her personal counseling sessions. (Exhibits 11, 14.)
Antoinette D. failed to cooperate with unannounced home visits from September 1997 through October of 1998, and failed to respond to mail communications. (Exhibits 33, 34.) Overall, Antoinette D. has failed to keep DCF reasonably advised of her whereabouts. She misled DCF concerning her living arrangements when receiving unsupervised weekend visits with her children from October 1999 through December 1999. (Exhibit 35; Testimony of Cynthia P.) She moved her residence at least three times between January and September 2000, and each time failed to notify DCF. (Exhibit 24.) From September 25 through November 21, 2000, Antoinette D. did not keep her DCF worker fully advised of her whereabouts, and had no contact with the agency. (Exhibit 20.) She had no contact with DCF from March 30, 2000 through September of that year. Antoinette D. has persisted in using drugs notwithstanding the specific steps and expectations that prohibited substance abuse. She tested positive for cocaine, morphine and codeine on December 21, 1999, leading to the suspension of visits with Andrea in January 2000. (Exhibits 24, 35, 36.) CT Page 4881 She failed to participate in a substance abuse evaluation subsequently recommended by DCF on January 28, 2000. (Exhibit 23.)
Antoinette D. has failed to obtain housing appropriate for her and her children. (Exhibit 34, 36.) She was evicted from an otherwise appropriate apartment in 1999 due to non-payment of rent, and has been pressed into alternative "residence at the St. Vincent de Paul Shelter. (Exhibit 23; Testimony of Cynthia P.) She has reported residing at locations which are actually vacant and without electrical power. (Exhibit 22.) She has also been homeless for periods of time. (Testimony of Betty D.) She has remained unemployed for long periods of time. (Exhibit 23.) Antoinette D. has further refused to sign releases for all of her treatment providers. (Exhibit 36.) As noted above, Antoinette D. failed to comply with court orders for attendance at psychological examinations on September 19, 2000. Detailed non-compliance with the courtordered expectations of August 15, 1997 is set forth in Exhibit 34, and non-compliance with the court-ordered expectations of March 11, 1998 is set forth in Exhibit 35. Furthermore, Antoinette D. failed to comply with the court steps and expectations which prohibited criminal activity, and was placed on probation as the result of a sentence imposed August 14, 2000 in response to her actions. See Part I. A. 5., above.
On balance, Antoinette D. has failed to effectively comply' with the court orders issued in this matter.
4. FEELINGS AND EMOTIONAL TIES OF THE CHILDREN — § 17a-112(d)(4)
As to the children's feelings and emotional ties with respect to their biological parents and caretakers, the court finds by clear and convincing evidence that each child has developed strong emotional ties with his or her current foster parents. While voicing some ambivalence about reunification, Antwoine and David have stated that they want to stay in their current home, and do not want to return to the care of either biological parent. (Exhibits 22, 35, 36.) These boys are extremely bonded to their foster parents, whom they identify as "mom" and "dad," and they are quite comfortable with their extended foster family. (Exhibits 22, 36; Testimony of Dorothy C., Cynthia P.) Sarah, and Olivia are bonded to their foster parents, as well: these girls have not inquired about Antoinette D. for some time. (Testimony of Rubia P., Cynthia P.; Exhibit 22.) Andrea is also bonded to her current foster family: she has no present recollection of Antoinette D., and has never spontaneously referred to her biological mother (Testimony of Yvonne C., Cynthia P.)
Notwithstanding the unsupervised overnight visitation that transpired CT Page 4882 in the fall of 1999, there was insufficient evidence from which the court could conclude that any of the older children had routinely expressed interest in Antoinette D., asked about her, or requested the opportunity to visit with her. They refer to her as "Toni", and do not recognize Antoinette D. as a part of their caretaking and support system, although she is an important figure to them. (Exhibit 22.)
5. AGES OF THE CHILDREN — § 17a-112 (d)(5)
Antwoine is eleven years old; David is seven years old; Olivia is six years old; Sarah is five years old; and Andrea is three years old.
6. EFFORTS MADE BY THE PARENTS TO ADJUST — § 17a-112 (d)(6)
As to the efforts Antoinette D. has made to adjust her circumstances, conduct or conditions to make it in the best interest of these children to return to her home in the foreseeable future, the evidence in this case clearly and convincingly indicates that she has failed to maintain due contact with either the children, DCF or the foster families. While Antoinette D. has had some visitation with the children, the court received no evidence that she has ever supported them financially or emotionally, or that she has made significant contributions to their well-being. Despite DCF's proffer of additional opportunities for visitation should she fulfill certain conditions in response to her recurrent drug use, such as drug screening: Antoinette D. failed to comply with these conditions, accepting instead the resulting loss of visitation opportunities. (Testimony of Cynthia P.)
The court further finds that Antoinette D.'s failure to maintain demonstrated prolonged sobriety indicates that she has not made meaningful or sustained efforts to conform her conduct to even minimally acceptable standards for the parent of young children. Her limited visits, her persistent drug use, her failure to comply with requests for substance abuse evaluations, her failure to maintain employment or an adequate residence, all indicate that this respondent mother was not committed to establishing and maintaining a stable parent-children relationship. See In re Michael L., supra, 56 Conn. App. 688, 694,745 A.2d 847 (2000).
 7. EXTENT TO WHICH PARENT WAS PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILDREN — § 17a-112 (d)(7)
As to the extent to which either parent has been prevented from maintaining a meaningful relationship with these five children by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of CT Page 4883 the parent, the court finds by clear and convincing evidence that while the respondent Antoinette D.'s means were limited, no extrinsic factors existed, other than the structure of the foster care system in general, which prevented regular, continuing contact with either the children or the foster families. Although time away from the children acted as a partial barrier to maintaining the parent-child relationship, it is clear that the children had been maintained in foster care to keep them safe while Antoinette D. was proceeding with her rehabilitation process.
In August of 1998, when Andrea was a year old, Antoinette D. asked for the opportunity to visit her on Saturdays, to accommodate her work schedule. However, DCF had no Saturday visitation sessions, and therefore could not meet her request. (Exhibit 34.) The court finds that DCF's failure in this regard did not in any way prevent formation of a parent-child relationship.
Furthermore, although DCF limited Antoinette D.'s visitation opportunities in response to her positive drug tests from December of 1999, as noted above, the agency set reasonable conditions in an appropriate effort to serve the dual salutary goals of enhancing her recovery process and protecting the children from their mother's persistent substance abuse. (Testimony of Cynthia P.) DCF's efforts in thus limiting visitation were a direct response to Antoinette D.'s substance abuse issues, and cannot reasonably be identified as an unreasonable intrusion into her maintenance of relationships with her children, within the meaning of § 17a-112 (d)(6).
B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (c)(2)
The court is next called upon to determine whether termination of the parental rights of Antoinette D. and David Sr. would be in the best interests of Antwoine, David, Olivia, Sarah or Andrea.[40] "[T]he question. . ., to be decided in a dispositional phase is whether it is in the best interests of the child to sever the parent-child relationship. That is different from the question of who should have custody of the child if termination of parental rights is determined to be in the best interests of the child. See Practice Book § 33-5." In re Carissa K.,55 Conn. App. 768, 776, 740 A.2d 896 (1999). "The dispositional phase, like its adjudicatory cousin, also must be supported on the basis of clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 207, 742 A.2d 415
(1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). "In making this determination, the trial court can consider all events occurring prior to the date of the dispositional hearing, including those occurring after the filing of the termination petition." (Citation omitted.) In reKasheema L., 56 Conn. App. 484, 488, 744 A.2d 441 (2000). As noted, CT Page 4884 "[t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Citations omitted; internal quotation marks omitted.) In re Shyina B., supra, 58 Conn. App. 167, quoting Schult v.Schult, 241 Conn. 767, 777, 699 A.2d 134 (1997).
The court finds, based on the clear and convincing evidence presented at trial, that all five of Antoinette D.'s children require stability of placement and continuity of care in order to maximize their opportunities for healthy development and a well-adjusted childhood. They require timely closure of the issues related to whether or not their biological mother will be able to assume a responsible position in their lives within in a reasonable period of time: the court has answered this question in the negative, given the ages and needs of these children. Inre Amy H., supra, 56 Conn. App. 60; In re Hector L., supra,53 Conn. App. 366-67.
DCF has admitted that Antoinette D. is attached to her four eldest children, and there is some evidence to suggest that she remains an important figure in their lives. (Exhibit 33.) However, on balance, Antwoine's and David's attachment to their foster parents is far stronger and far more secure than their feelings for Antoinette D., representing a bond that has been established through the foster parents' successful efforts at supporting, guiding, and inspiring these boys. Their status is mirrored by that of Olivia and Sarah, who have developed stronger feelings for their foster parents than they have for their biological mother, again attributable to the foster parents' commitment toward their positive growth, development and security. (Exhibit 22.)
As discussed elsewhere in this opinion, David Sr. has consented to the TPR petitions concerning each of these children. Based on the extensive information discussing his situation as set forth in the Social Studies and related documents presented at trial, and based upon the evidence of his inability or unwillingness to cooperate in the process of developing appropriate parenting skills, as set forth in Part I. B., above, the court finds that the best interests of Antwoine, David, Sarah, Olivia and Andrea cannot be served by continuing their legal relationship with their father. Their healthy growth, development, well-being, and stable living arrangements, elements requisite to meeting their best interests, can be accomplished through disposition which incorporates termination of his parental rights. In re Shyina B., supra, 58 Conn. App. 167
As discussed in Part II. B. 3. above, no bond has at any time appeared to exist between this mother and Andrea, her youngest daughter. As noted, at an observed visit held in June of 1999 when Andrea was a toddler, the child appeared to be tense and unhappy due to her mother's CT Page 4885 presence: she was markedly unwilling to communicate verbally with Antoinette D. (Exhibits 18, 24.) The child has never recognized her biological mother as a parental figure, nor has she ever borne any specific attachment to her. (Exhibits 18, 24, 33, 34.)
The four older children are extremely fortunate, as their foster placements have been stable since their commencement in January of 1998. Antwoine's and David's foster mother credibly established the love that she and her husband have for these boys. (Testimony of Dorothy C.) While their foster parents have expressed interest in adopting them and they are committed to providing for them on a continuing basis, they may be able to provide only long term foster care which is still stable and secure in nature. (Exhibit 22.; Testimony of Dorothy C.)
Olivia's and Sarah's foster parents love these girls, and their love is returned by the children. Olivia and Sarah call their foster parents "Mom" and "Dad", and refer to their biological mother as "Toni." This foster mother credibly testified that she and her husband are interested in adopting not only Olivia and Sarah, but that they would open their home for adoption of Andrea as well, if she becomes available. (Exhibit 22; Testimony of Rubia P.)
Dr. Haymes's psychological report puts into clear perspective the great importance of the bonds these children have developed with their foster parents. He commented that when a child is securely bonded to the foster parents, but has little relationship with the biological parents, and has already undergone at least one separation from the biological parents, "there is a great risk to [the child] in having the relationship with [the] foster parents disrupted. . . . It has been found that these separations, even at very early ages, have significant impact on children's lives." (Exhibit 18.) Speaking of Andrea, he wrote that "[t]o risk disrupting the child from [the] secure attachments of present in order to bond with her mother is a very high risk proposition for a child who already has some developmental delays." (Exhibit 18.) To foster need for another disruption would place each of Antoinette D.'s children at significant risk for problematic growth and development, without any realistic expectation that Antoinette D. could, within a foreseeable time, serve as a resource for their long-term placement. (See Exhibit 18.)
Antoinette D. has attachments to her children, but there was insufficient evidence from which this court could determine that this relationship provides a measurable benefit to Antwoine, David, Olivia or Sarah: it has no identifiable value from Andrea's perspective. Antoinette D. does not appear to recognize the damaging effects that her critical comments about the children's appearance or her constant questioning CT Page 4886 about the quality of their foster care has had upon Antwoine, or his siblings. See Exhibit 35. This apparent lack of insight combined with her manifest lack of interest in these children, her recurrent drug use, and her consistently unstable lifestyle make it clear that Antoinette D.'s parenting skills are, at best, immature and ineffective despite three years of service provision. Under circumstances demonstrating that Andrea has thrived under the care of her foster parents and has developed strong ties to care givers other than Antoinette D., while the respondent mother has not demonstrated meaningful progress toward developing a relationship with Andrea, the court must conclude that to allow further time for the establishment or reestablishment of a mother-child relationship would unreasonably delay Andrea's opportunities for achieving permanency in placement, without appropriate benefit to her. Such a delay would thus be detrimental to the best interests of the child. See § 17a-112 (c)(3) (D).
Counsel for the children, serving also as their GAL,[41] has urged the court to recognize that Antoinette D. has not demonstrated sufficient control over her substance abuse issues to allow reunification to remain a valid goal in this case. She acknowledged, as does the court, that Antoinette D. had, on at least one occasion, established a degree of sobriety that had earned her the opportunity for overnight visitation with her older children. Even this happy improvement in Antoinette D.'s situation proved temporary, however, as she succumbed yet again to the influences of her substance abuse habit. The children's representative has pointed to numerous aspects of the evidence which support her conclusion that the best interests of these children cannot be fulfilled by allowing them to be returned to the care of Antoinette D., including the respondent mother's noted relapse into drug use, her effective abandonment of all five children through her consistent failure to visit them, her noncompliance with court orders prohibiting criminal activity and her failure to maintain adequate income or housing. The court concurs with the argument that these factors all compellingly indicate that Antoinette D. lacks the degree of interest in or responsibility for Antwoine, David, Olivia, Sarah and Andrea that one would reasonably expect from one who is, or will be in the foreseeable future, an appropriate primary care giver.
This court credits and accepts the representations made by counsel for the minor children who argued that they each deserve, and require, permanency and stability in their placement. Antwoine and David, Olivia and Sarah are each bonded to foster parents who are prepared to provide them with adoption or long term care, and they have resided in these foster homes with comfort and success for several years. Andrea is bonded to her current foster parents, as well, and is expected to do well in her placement with her sisters, Sarah and Olivia. The court agrees that the CT Page 4887 best interests of these children will best be met by severing the parental rights of Antoinette D., so that these children may form permanent, lasting relationships with care givers who are interested in and attentive to them, who are responsible for them and receptive to their needs, and who are committed to addressing the children's best interests as they emerge into adulthood.
"It is clear that the respondent loves her children and wants them back. . . . [H]owever, a parent's love and biological connection . . . is simply not enough. [The department] has demonstrated by clear and convincing evidence that [the respondent] cannot be a competent parent to these children because she cannot provide them a nurturing, safe and structured environment." (Internal quotation marks omitted.) In re AshleyS., supra, 61 Conn. App. 557. As discussed in Part II. B. 3. b., above, additional time would not likely bring Antoinette D.'s performance, as a parent, within acceptable standards sufficient to make it in the best interests of these children for them to be reunited with her biological mother.[42] (See Exhibit 22.)
This court "genuinely sympathize[s] with the respondent and acknowledge[s] her sincere efforts at rehabilitation." Id. However, the best interests of Antwoine, David, Olivia, Sarah and Andrea must here be served, and this court finds that their "sustained growth, development, wellbeing, and the continuity and stability of their environments will be best accomplished through the termination of Antoinette D.'s parental rights. In re Shyina B., supra, 58 Conn. App. 167.
 IV. ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the children's best interests to terminate the parental rights of Antoinette D. and David Sr., accordingly ORDERS:
That the parental rights of Antoinette D. and David Sr. are hereby terminated as to Antwoine D., David J., Olivia J., Sarah J., and Andrea J.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Antwoine D., David J., Olivia J., Sarah J., and Andrea J., for the purpose of securing an adoptive family or other permanent placement for these children.
That within thirty days of this judgment a written report addressing a CT Page 4888 permanency plan for these children shall be submitted by the Commissioner, and that such further reports shall be filed by DCF as are required by state and federal law.
BY THE COURT,
N. Rubinow, J.